# IN THE COURT OF COMMON PLEAS
## BUTLER COUNTY, OHIO
### CIVIL DIVISION

2015  05  1183

**DAVID SNIDER,**
509 Roberston Road
Felicity, Ohio 45120

         **Plaintiff,**

**v.**

**ABUBAKAR ATIQ DURRANI, M.D.,**
Pakistan
(Served via regular mail through
the Hague Convention)

And

**CENTER FOR ADVANCED SPINE
TECHNOLOGIES, INC.**
(Served via regular mail through
the Hague Convention)

And

**WEST CHESTER HOSPITAL, LLC**
7700 UNIVERSITY DRIVE
WEST CHESTER, OH 45069
SERVE: GH&R BUSINESS SVCS., INC.
511 WALNUT STREET
1900 FIFTH THIRD CENTER
CINCINNATI, OH 45202
(Serve via Certified mail)

And

**UC HEALTH**
SERVE: GH&R BUSINESS SVCS., INC.
511 WALNUT STREET
1900 FIFTH THIRD CENTER
CINCINNATI,OH 45202
(Serve via Certified mail)
         **Defendants.**

Case No.

JUDGE Guckenberger

**COMPLAINT
& JURY DEMAND**

FILED BUTLER COUNTY
COURT OF COMMON PLEAS

MAY 18 2015

MARY L. SWAIN
CLERK OF COURTS

EXHIBIT A

1

Comes now the Plaintiff, David Snider, and files this Complaint and jury demand and state as follows:

1. This case was previously filed under case number CV 2013 04 1180 and was Ohio R. Civ. P. 41(A) voluntarily dismissed May 19, 2014.

2. At all times relevant, Plaintiff was a resident of and domiciled in the State of Ohio.

3. At all times relevant, Defendant Dr. Abubakar Atiq Durrani (hereinafter "Dr. Durrani") was licensed to and did in fact practice medicine in the State of Ohio.

4. At all times relevant, Center for Advanced Spine Technologies, Inc. (hereinafter "CAST"), was licensed to and did in fact perform medical services in the State of Ohio, and was and is a corporation authorized to transact business in the State of Ohio and Kentucky.

5. At all times relevant, West Chester Hospital, LLC (hereinafter "West Chester Hospital"), was a limited liability company authorized to transact business and perform medical services in the State of Ohio and operate under the trade name West Chester Hospital.

6. At all times relevant, Defendant UC Health Inc., was a duly licensed corporation which owned, operated and/or managed multiple hospitals including, but not limited to West Chester Hospital, and which shared certain services, profits, and liabilities of hospitals including West Chester.

7. At all times relevant herein, West Chester Medical Center, Inc., aka West Chester Hospital held itself out to the public, and specifically to Plaintiffs, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

2

8. UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC.

9. The amount in controversy exceeds the jurisdictional threshold of this Court.

10. The subject matter of the Complaint arises out of medical treatment by Defendants in Butler County, Ohio. This Court is thus the proper venue to grant Plaintiff the relief sought.

11. An Affidavit of Merit signed by Dr. Keith Wilkey, M.D. is attached as exhibit A.

## FACTUAL ALLEGATIONS OF PLAINTIFF

12. Plaintiff incorporates by reference each and every allegation in the paragraphs above.

13. Mr. Snider first saw Dr. Durrani in 2005 when he fell off a ladder in November 2005.

14. When he came to Dr. Durrani, he listed his pain as "intolerable" and "feeling utterly helpless" about his chronic pain.

15. In his initial CAST paperwork, Mr. Snider also indicated, "My ears flutter when I have back pain and my pain makes me angry and frustrated all of the time... temperature changes worsen pain...last surgeon consulted said he would not do surgery until I paralyzed myself, which he said could happen suddenly with just the wrong move."

16. These statements are conflicting in nature, and require further work up before a surgical option is suggested. A surgeon is not a therapist or an anger management counselor.

17. Dr. Durrani performed one surgery on Mr. Snider on 6/30/2010.

18. The signed hospital consent form states, "L5-S1 Axial Lumbar Interbody Fusion, L5-S1 Posterior Spinal Fusion, Lumbar 5-S1 Laminectomy and Foraminotomy."

19. Dr. Durrani lists procedures performed as "L5-S1 axial lumbar interbody fusion using allograft, L5-S1 axial lumbar interbody cage, Posterior spinal instrumentation L5-S1,

Posterior spinal fusion using auto and allograft L5-S1, Lumbar laminectomy L5-S1, Bilateral lumbar foraminotomies L5-S1.

20. Surgery completed on 06/30/10, and was dictated on 10/31/10.

21. Defendants never explained to Plaintiff that the surgery would be an experiment, involving the use of BMP-2.

22. When Dr. Durrani performed Mr. Snider's spinal fusion operation, he used only the rhBMP-2 bone graft component of the Infuse device and employed a posterior approach, which is not approved by the FDA.

23. Dr. Durrani did not use the other components of the Infuse device, the FDA approved cage or the spongy carrier.

24. The off label use of BMP without the expressed or written consent and/or knowledge of Mr. Snider is a violation of standards of care, as well as a violation of the manner in which BMP could be used, in accordance with the FDA.

25. Dr. Durrani promised that David Snider would experience immediate pain relief following surgery. Instead, her pain has been far worse and extreme since the surgery.

26. David Snider was misled by defendants concerning the extent, nature, and duration of the surgery that was to be performed.

27. Plaintiffs' post-operative consultations occurred with Dr. Durrani at CAST.

28. On two different post ops visits, Dr, Durrani records conflicting documentation.

29. 09/28/10 Post Op Visit: "He is now able to walk. As you recall, before surgery he was in a wheelchair, could hardly stand up. Now he is walking, ambulating with just a cane....He still is battling pain because, unfortunately, he was on so much pain medicine before."

30. 8/25/11 Post Op Visit: "He is still complaining of a lot of back pain. He has done physical therapy, aquatic therapy. He is currently on narcotics by yourself and does not seem to be getting any better." (No documentation of ANY therapy at CAST or The Spine Institute)

31. Dr. Durrani misled Plaintiff about the after-effects of BMP/Infuse and the actual nature and extent of the surgery Defendants had performed.

32. Dr. Durrani should have thoroughly reviewed Mr. Snider's medical records and any conservative approaches that had tried and failed, as well as thoroughly educate the patient regarding reasonable outcomes, importance of physical therapy compliance, and narcotic medication education and safety.

33. During the surgery, Defendants experimentally used BMP-2/Infuse without David Snider's consent or knowledge.

34. Defendants did not obtain Plaintiff's consent to use BMP-2/Infuse prior to the surgery.

35. Defendants did not disclose their intent to use BMP-2/Infuse, and further, did not disclose their intent to use BMP-2/Infuse in a way not approved by the FDA.

36. During Plaintiff's surgery, Defendants did not use the LT-Cage, which is required when using BMP-2.

37. David Snider is in pain all of the time, and has missed work because of it. He feels Dr. Durrani made his pain worse, and then abandoned him.

38. Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

39. As a direct and proximate result of this surgery and Dr. Durrani's actions, Plaintiff has suffered harm.

5

40. Plaintiff did not become aware of Dr. Durrani's use of Infuse/BMP-2 until legal counsel informed Plaintiff of his propensity to use the drug.

41. Defendants fraudulently induced David Snider and his insurance company to pay for the surgery.

## INFUSE/BMP-2

42. BMP-2 Is a Bone Morphogenic Protein and Grows Bone.

43. BMP-2 Is a Biologic.

44. Once BMP-2 becomes infused with the Bone it can not be removed.

45. Dr. Durrani oftentimes used BMP-2 and/or Puregen "off-label" when performing surgeries.

46. BMP-2 is manufactured, marketed, sold and distributed by Medtronic under the trade name "Infuse."

47. Dr. Durrani is a consultant for Medtronic.

48. Defendants did not inform Plaintiff of Durrani's financial interest, conflicts of interest or consulting arrangement with Medtronic.

49. Medtronic, provided in writing to Dr. Durrani and CAST the approved uses for BMP-2, the substance also referred to as Infuse, which is a bone morphogenic protein, used as an artificial substitute for bone grafting in spine surgeries.

50. BMP-2 is not approved by the Food and Drug Administration for use in the thoracic spine.

51. BMP-2 is neither safe nor approved for use on children less than twenty one (21) years of age.

52. For use in spinal surgery, BMP-2/Infuse is approved by the FDA for a limited procedure, performed on a limited area of the spine, using specific components. Specifically, the FDA approved Infuse for one procedure of the spine: Anterior Lumbar Interbody Fusion ("ALIF" or "Anterior" approach); and only in one area of the spine: L4 to S1; and only when used in conjunction with FDA-Approved Components: LT-CAGE Lumbar Tapered Fusion Device Component ("LT-CAGE")

53. Use of Infuse in cervical or thoracic surgery, or use through the back (posterior), or side (lateral), or on areas of the spine outside of the L4-S1 region (e.g., the cervical spine), or using components other than or in addition to the LT-CAGE is not approved by the FDA, and thus such procedures and/or use of non-FDA approved componentry is termed "off-label."

54. When used off-label, Infuse frequently causes excessive or uncontrolled (also referred to as "ectopic" or "exuberant") bone growth on or around the spinal cord. When nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and cramps in limbs.

55. The product packaging for BMP-2/Infuse indicates it causes an increased risk of cancer four (4) times greater than other bone graft alternatives.

56. Dr. Durrani, CAST staff and employees, and West Chester/UC Health personnel did not disclose to Plaintiff their intent to use BMP-2/Infuse, and further, did not disclose their intent to use BMP-2/Infuse in a way not approved by the FDA.

57. Dr. Durrani used BMP-2 in Plaintiff in a manner not approved by Medtronic or the FDA.

58. Plaintiff was not informed by Defendants that Dr. Durrani used Infuse/BMP-2 in her surgeries.

7

59. Plaintiff would not have allowed BMP-2 to be used by Dr. Durrani in her surgeries in a manner that was not approved by the FDA or Medtronic, Infuse/BMP-2's manufacturer.

60. Plaintiff would not have consented to the use of BMP-2 in her body if informed of the risks by Dr. Durrani, CAST staff and employees, or any West Chester/UC Health personnel.

61. The written informed consent of Dr. Durrani and CAST signed by Plaintiff lacked the disclosure of Infuse/BMP-2's use in her procedures.

62. Plaintiff never received a verbal disclosure of Infuse/BMP-2 from Dr. Durrani, CAST staff and employees, or any West Chester/UC Health personnel.

63. Medtronic specifically required Infuse/BMP-2 only be used in "skeletally mature patients" with degenerative disc disease.

64. Medtronic required at least six (6) months of non-operative treatment prior to use of Infuse/BMP-2.

65. Dr. Durrani regularly used Infuse/BMP-2 without this six (6) month non-operative treatment.

66. Medtronic required BMP-2 always be used in conjunction with a metal LT cage.

67. Dr. Durrani regularly used BMP-2 without a proper LT cage in his surgeries.

## DR. DURRANI COUNTS:

## COUNT I: NEGLIGENCE

68. Defendant Dr. Durrani owed his patient, Plaintiff, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

69. Defendant Dr. Durrani breached his duty by failing to exercise the requisite degree of

skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, and improper follow-up care addressing a patient's concerns.

70. As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of the Defendant Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT II: BATTERY

71. Dr. Durrani committed battery against Plaintiff by performing a surgery that was unnecessary, contraindicated for Plaintiff's medical condition, and for which he did not properly obtain informed consent, inter alia, by using BMP-2, PureGen and/or Baxano in ways and for surgeries not approved by the FDA and medical community, and by the failure to provide this information to Plaintiff.

72. Plaintiff would not have agreed to the surgeries if they knew the surgeries was/were unnecessary, not approved by the FDA, and not indicated.

73. As a direct and proximate result of the aforementioned battery by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: LACK OF INFORMED CONSENT

74. The informed consent forms from Dr. Durrani and CAST which they required Plaintiff to sign failed to fully cover all the information necessary and required for the procedures and surgical procedures performed by Dr. Durrani.  Dr. Durrani and CAST each required an informed consent release.

9

75. In addition, no one verbally informed Plaintiff of the information and risks required for informed consent at the time of or before Plaintiff's surgery.

76. Dr. Durrani failed to inform Plaintiff of material risks and dangers inherent or potentially involved with her surgeries and procedures.

77. Had Plaintiff been appropriately informed of the need or lack of need for surgery and other procedures and the risks of the procedures, Plaintiff would not have undergone the surgery or procedures.

78. As a direct and proximate result of the lack of informed consent, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

79. Dr. Durrani's conduct as described above was intentional and reckless.

80. It is outrageous and offends against the generally accepted standards of morality.

81. It was the proximate and actual cause of Plaintiff's psychological injuries, emotional injuries, mental anguish, suffering, and distress.

82. Plaintiff suffered severe distress and anguish so serious and of a nature that no reasonable man or woman would be expected to endure.

## COUNT V: FRAUD

83. Dr. Durrani made material, false representations to Plaintiff and their insurance company related to Plaintiff's treatment including: stating the surgeries were necessary, that Plaintiff could have children as a result of surgery, that more conservative treatment was unnecessary and futile, that Plaintiff would be walking normally within days after each surgery, that the procedures were medically necessary and accurately reported on the

10

billing to the insurance company, that the surgery was successful, and that Plaintiff was medically stable and ready to be discharged.

84. Dr. Durrani also concealed the potential use of Infuse/BMP-2 and/or Puregen in Plaintiff's surgery, as well as other information, when he had a duty to disclose to Plaintiff his planned use of the same.

85. These misrepresentations and/or concealments were material to Plaintiff because they directly induced Plaintiff to undergo her surgery.

86. Dr. Durrani knew or should have known such representations were false, and/or made the misrepresentations with utter disregard and recklessness as to their truth that knowledge of their falsity may be inferred.

87. Dr. Durrani made the misrepresentations before, during and after the surgeries with the intent of misleading Plaintiff and their insurance company into relying upon them. Specifically, the misrepresentations were made to induce payment by the insurance company, without which Dr. Durrani would not have performed the surgeries, and to induce Plaintiff to undergo the surgeries without regard to medical necessity and only for the purpose of receiving payment.

88. The misrepresentations and/or concealments were made during Plaintiff's office visits at Dr. Durrani's CAST offices.

89. Plaintiff was justified in their reliance on the misrepresentations because a patient has a right to trust their doctor and that the facility is overseeing the doctor to ensure the patients of that doctor can trust the facility.

90. As a direct and proximate result of the aforementioned fraud, Plaintiff did undergo surgeries which were paid for in whole or in part by their insurance company, and suffered all damages as requested in the Prayer for Relief.

## CAST COUNTS:

## COUNT I: VICARIOUS LIABILITY

91. At all times relevant, Defendant Dr. Durrani was an agent, and/or employee of CAST.

92. Dr. Durrani is in fact, the owner of CAST.

93. Defendant Dr. Durrani was performing within the scope of his employment with CAST during the care and treatment of Plaintiff.

94. Defendant CAST is responsible for harm caused by acts of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

95. Defendant CAST is vicariously liable for the acts of Defendant Dr. Durrani alleged in this Complaint including all of the counts asserted against Dr. Durrani directly.

96. As a direct and proximate result of Defendant CAST's acts and omissions, Plaintiff sustained all damages requested in the Prayer for Relief.


## COUNT II: NEGLIGENT HIRING, RETENTION, AND SUPERVISION

97. CAST provided Dr. Durrani, inter alia, financial support, control, medical facilities, billing and insurance payment support, staff support, medicines, and tangible items for use on patients.

98. CAST and Dr. Durrani participated in experiments using BMP-2 and/or Puregen bone graft on patients, including Plaintiff, without obtaining proper informed consent thereby causing harm to Plaintiff.

12

99. CAST breached its duty to Plaintiff, inter alia, by not supervising or controlling the actions of Dr. Durrani and the doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiff at CAST.

100.    The Safe Medical Device Act required entities such as CAST to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

101.    Such disregard for and violations of federal law represents strong evidence that CAST negligently hired, retained, and supervised Dr. Durrani.

102.    As a direct and proximate result of the acts and omissions herein described, including but not limited to failure to properly supervise medical treatment by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT IV: OHIO CONSUMER SALES PROTECTION ACT

103.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

104.    CAST's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

105.    CAST omitted suppressed and concealed from Plaintiffs facts with the intent that Plaintiffs rely on these omissions, suppressions and concealments as set forth herein.

106.    CAST's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and

13

practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

107.    CAST was fully aware of its actions.

108.    CAST was fully aware that Plaintiffs were induced by and relied upon CAST's representations at the time CAST was engaged by Plaintiffs.

109.    Had Plaintiffs been aware that CAST's representations as set forth above were untrue, Plaintiffs would not have used the services of Defendants.

110.    CAST, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

111.    CAST's actions were not the result of any bona fide errors.

112.    As a result of CAST's unfair, deceptive and unconscionable acts and practices, Plaintiffs have suffered and continues to suffer damages, which include, but are not limited to the following:

a.    Loss of money paid

b.    Severe aggravation and inconveniences

c.    Under O.R.C. 1345.01 Plaintiffs are entitled to:

    i.    An order requiring that CAST restore to Plaintiffs all money received from Plaintiffs plus three times actual damages and/or actual/statutory damages for each violation;

    ii.    All incidental and consequential damages incurred by Plaintiffs;

    iii.    All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

## WEST CHESTER HOSPITAL/UC HEALTH COUNTS:

### COUNT I: NEGLIGENCE

113.     West Chester Hospital/UC Health owed their patient, Plaintiff, through its agents

and employees the duty to exercise the degree of skill, care, and diligence an ordinarily

prudent health care provider would have exercised under like or similar circumstances.

114.     West Chester Hospital/UC Health acting through its agents and employees

breached their duty by failing to exercise the requisite degree of skill, care and diligence

that an ordinarily prudent health care provider would have exercised under same or

similar circumstances through, among other things, negligent diagnosis, medical

mismanagement and mistreatment of Plaintiff, including but not limited to improper

selection for surgery, improper performance of the surgery, improper assistance during

Plaintiff's surgeries and improper follow up care addressing a patient's concerns.

115.     The agents and employees who deviated from the standard of care include nurses,

physician assistants, residents and other hospital personnel who participated in Plaintiff's

surgeries.

116.     The management, employees, nurses, technicians, agents and all staff during the

scope of their employment and/or agency of West Chester Hospital/UC Health's

knowledge and approval, either knew or should have known the surgery was not

medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the

pre-op evaluation and assessment; and the violation of their responsibility under the

bylaws, rules, regulations and policies of West Chester Hospital/UC Health.

117.     As a direct and proximate result of the aforementioned negligence and deviation

from the standard of care by the agents and employees of West Chester Hospital/UC

15

Health, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT II: NEGLIGENT CREDENTIALING, SUPERVISION, AND RETENTION

118.    As described in the Counts asserted directly against Dr. Durrani, the actions of Dr. Durrani with respect to Plaintiff constitute medical negligence, lack of informed consent, battery, and fraud.

119.    West Chester Hospital/UC Health negligently credentialed, supervised, and retained Dr. Durrani as a credentialed physician, violating their bylaws and JCAHO rules by:

    a.  Allowing Dr. Durrani to repeatedly violate the West Chester Hospital/UC Health bylaws with it's full knowledge of the same;

    b.  Failing to adequately review, look into, and otherwise investigate Dr. Durrani's educational background, work history and peer reviews when he applied for and reapplied for privileges at West Chester Hospital;

    c.  Ignoring complaints about Dr. Durrani's treatment of patients reported to it by West Chester Hospital staff, doctors, Dr. Durrani's patients and by others;

    d.  Ignoring information they knew or should have known pertaining to Dr. Durrani's previous privileged time at other Cincinnati area hospitals, including Children's Hospital, University Hospital, Deaconess Hospital, Good Samaritan Hospital and Christ Hospital.

120.    The Safe Medical Device Act required entities such as West Chester Hospital/UC Health to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

121.     As a direct and proximate result of the negligent credentialing, supervision, and retention of Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

### COUNT III: FRAUD

122.     West Chester Hospital/UC Health through their nursing staff, billing department, and other employees either concealed from Plaintiff facts they knew about Dr. Durrani, including that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's surgery, or misrepresented to Plaintiff the nature of the surgery, and the particular risks that were involved therein.

123.     West Chester Hospital/UC Health's concealments and misrepresentations regarding Infuse/BMP-2 or Puregen and the nature and risks of Plaintiff's surgeries were material facts.

124.     Because of its superior position and professional role as a medical service provider, West Chester Hospital/UC Health had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

125.     According to Dr. Peter Stern, he knew Dr. Durrani was only "satisfactory" and not a world class surgeon as West Chester advertised.

126.     According to Jill Stegman, the risk manager at West Chester, she and others knew Dr. Durrani had "issues".

127.     According to former nursing manager, Elaine Kunko, West Chester Hospital knew about Dr. Durrani not completing records and claiming surgeries were emergencies when they were not.

17

128.     West Chester Hospital/UC Health intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgery, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at West Chester Hospital/UC Health.

129.     Plaintiff was unaware that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgeries and therefore, was unaware of the health risks of Infuse/BMP-2 or Puregen's use in Plaintiff's spine.

130.     Had Plaintiff known before Plaintiff's surgeries that Infuse/BMP-2 or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgeries with Dr. Durrani at West Chester Hospital/UC Health.

131.     West Chester Hospital/UC Health fraudulently billed Plaintiff and Plaintiff's insurance company following his discharge on 7/2/2010. Billing is attached as Exhibit B.

132.     Defendant West Chester Hospital fraudulently billed $9,344.30 for INFUSE SET BONE GRFT SM for the use of BMP-2. Billing is attached as exhibit B.

133.     Defendants fraudulently billed for FOAM BIOACT VITOSS PACK 5CC $5,629.50 for the use of BMP-2. Billing is attached as exhibit B.

134.     These bills, prepared and issued by West Chester Hospital/UC Health employees, constituted affirmative representations by West Chester Hospital/UC Health that the charges related to Plaintiff's surgeries were medically appropriate and properly documented.

135.     West Chester Hospital's employee and director of finance, Mike Jeffers, approved all of these billings, tracked Dr. Durrani's financial numbers and catered to Dr. Durrani in

18

the form of bonuses and multiple surgery suites as Dr. Durrani was the highest money

generator for West Chester Hospital.

136.    The bills were sent with the knowledge of West Chester Hospital/UC Health that

in fact Plaintiff's surgeries were not appropriately billed and documented and that the

services rendered at West Chester Hospital/UC Health associated with Dr. Durrani were

not appropriate.

137.    The bills sent by West Chester Hospital/UC Health to Plaintiff falsely represented

that Plaintiff's surgeries were appropriately indicated, performed and medically necessary

in contra-indication of the standard of care.

138.    As a direct and proximate result of the fraud upon Plaintiff by West Chester

Hospital/UC Health, Plaintiff sustained all damages requested in the prayer for relief.

### COUNT V: OHIO CONSUMER SALES PROTECTION ACT

139.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq.

exempts physicians, a transaction between a hospital and a patient/consumer is not

clearly exempted.

140.    West Chester Hospital/UC Health's services rendered to Plaintiff constitute a

"consumer transaction" as defined in ORC Section 1345.01(A).

141.    West Chester Hospital/UC Health omitted suppressed and concealed from

Plaintiffs facts with the intent that Plaintiffs rely on these omissions, suppressions and

concealments as set forth herein.

142.    West Chester Hospital/UC Health's misrepresentations, and its omissions,

suppressions and concealments of fact, as described above, constituted unfair, deceptive

and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

143.     West Chester Hospital/UC Health was fully aware of its actions.

144.     West Chester Hospital/UC Health was fully aware that Plaintiffs were induced by and relied upon West Chester Hospital/UC Health's representations at the time West Chester Hospital/UC Health was engaged by Plaintiffs.

145.     Had Plaintiffs been aware that West Chester Hospital/UC Health's representations as set forth above were untrue, Plaintiffs would not have used the services of Defendants.

146.     West Chester Hospital/UC Health, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

147.     West Chester Hospital/UC Health 's actions were not the result of any bona fide errors.

148.     As a result of West Chester Hospital/UC Health's unfair, deceptive and unconscionable acts and practices, Plaintiffs have suffered and continues to suffer damages, which include, but are not limited to the following:

   a.  Loss of money paid

   b.  Severe aggravation and inconveniences

   c.  Under O.R.C. 1345.01 Plaintiffs are entitled to:

        i.  An order requiring West Chester Hospital/UC Health restore to Plaintiffs all money received from Plaintiffs plus three times actual damages and/or actual/statutory damages for each violation;

        ii.  All incidental and consequential damages incurred by Plaintiffs;

iii.  All reasonable attorneys' fees, witness fees, court costs and other fees
incurred;

## COUNT VI: PRODUCTS LIABILITY

149.  At all times Infuse/BMP-2 and Puregen are and were products as defined in R.C.
§ 2307.71(A)(12) and applicable law.

150.  West Chester Hospital/UC Health (aka supplier) supplied either Medtronic's (aka
manufacturer) Infuse/BMP-2 or Alphatec Spine's (aka manufacturer) Puregen for surgery
performed by Dr. Durrani on Plaintiff.

151.  West Chester Hospital/UC Health, as a supplier, failed to maintain either
Infuse/BMP-2 or Puregen properly.

152.  West Chester Hospital/UC Health did not adequately supply all components
required to use either Infuse/BMP-2 or Puregen properly.

153.  West Chester Hospital/UC Health knew or should have known the FDA
requirements and Medtronic's requirements for using either Infuse/BMP-2 or Puregen.

154.  West Chester Hospital/UC Health stored either Infuse/BMP-2 or Puregen at its
facility.

155.  West Chester Hospital/UC Health ordered either Infuse/BMP-2 or Puregen for
surgery performed by Durrani.

156.  West Chester Hospital/UC Health did not adequately warn Plaintiff that either
Infuse/BMP-2 or Puregen would be used without all FDA and manufacturer required
components.

157.     West Chester Hospital/UC Health did not gain informed consent from Plaintiff for the use of either Infuse/BMP-2 or Puregen, let alone warn of the supplying of the product without FDA and manufacturer requirements.

158.     West Chester Hospital/UC Health failed to supply either Infuse/BMP-2 or Puregen (aka product) in the manner in which it was represented.

159.     West Chester Hospital/UC Health failed to provide any warning or instruction in regard to either Infuse/BMP-2 or Puregen, and failed to make sure any other party gave such warning or instruction.

160.     West Chester Hospital/UC Health intentionally billed Infuse/BMP-2 and/or Puregen as "Miscellaneous" to prevent discovery of the use of Infuse/BMP-2 and/or Puregen by Plaintiffs.

161.     Plaintiff suffered physical, financial, and emotional harm due to West Chester Hospital/UC Health's violation of the Ohio Products Liability act. Plaintiff's injuries were a foreseeable risk

162.     Plaintiff did not alter, modify or change the product, nor did Plaintiff know that the product was being implanted without all required components.

163.     West Chester Hospital/UC Health knew or should have known that the product was extremely dangerous and should have exercised care to provide a warning that the product was being used and that the product was being used outside FDA and manufacturer requirements. The harm caused to Plaintiff by not providing an adequate warning was foreseeable,

164.     West Chester Hospital/UC Health knew that the product did not conform to the representation of the intended use by the manufacturer yet permitted the product to be implanted into Plaintiff.

165.     West Chester Hospital/UC Health, as a supplier, acted in an unconscionable manner in failing to supply the product without all FDA and manufacturer required components.

166.     West Chester Hospital/UC Health, as a supplier, acted in an unconscionable manner in failing to warn Plaintiff that the product was being supplied without all FDA and manufacturer required components.

167.     West Chester Hospital/UC Health's actions demonstrate they took advantage of the Plaintiffs inability, due to ignorance of the product, to understand the product being implanted without FDA and manufacturer required components.

168.     West Chester Hospital/UC Health substantially benefited financially by the use of the product as the product allowed for West Chester Hospital/UC Health to charge more for the surgery.

169.     Plaintiff suffered economic loss as defined in R.C. § 2303.71(A)(2) and applicable law.

170.     Plaintiff suffered mental and physical harm due to West Chester Hospital/UC Health's acts and omissions.

171.     Plaintiff suffered emotional distress due to acts and omissions of West Chester Hospital/UC Health and is entitled to recovery as defined in R.C. § 2307.71(A)(7) and applicable law.

23

172.     West Chester Hospital/UC Health violated the Ohio Products Liability Act R.C. § 2307.71-2307.80

173.     West Chester Hospital/UC Health violated R.C. § 2307.71(A)(6)

174.     West Chester Hospital/UC Health violated The Ohio Consumer Sales Practices Act R.C. § 1345.02-.03.

**175.**     West Chester Hospital/UC Health provided inadequate warnings are defined in R.C, § 2307.76(A) and applicable law.


## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests and seeks justice in the form and procedure of a jury, verdict and judgment against Defendants on all claims for the following damages:

1.     Past medical bills;

2.     Future medical bills;

3.     Lost income and benefits;

4.     Lost future income and benefits;

5.     Loss of ability to earn income;

6.     Past pain and suffering;

7.     Future pain and suffering;

8.     Plaintiff seeks a finding that their injuries are catastrophic under Ohio Rev. Code §2315.18;

9.     Plaintiff seeks all relief available under the Ohio Products Liability Act R.C. § 2307.71-2307.80 and applicable law;

10.     All incidental costs and expenses incurred as a result of their injuries;

24

11.     The damages to their credit as a result of their injuries;

12.     Loss of consortium;

13.     Punitive damages;

14.     Costs;

15.     Attorneys' fees;

16.     Interest;

17.     All property loss;

18.     All other relief to which they are entitled including O.R.C. 1345.01

19.     Based upon 1-18 itemization of damages, the damages sought exceed the minimum

jurisdictional amount of this Court and Plaintiff seeks in excess of $25,000.


                                        Respectfully Submitted,

                                        _____
                                        Matt Hammer (#0092483)
                                        Cooper Bowen (#0093054)
                                        The Deters Law Firm
                                        5247 Madison Pike
                                        Independence, KY 41051
                                        Ph: (859) 363-1900
                                        Fax: (859) 363-1444
                                        scollins@ericdeters.com
                                        mhammer@ericdeters.com
                                        cbowen@ericdeters.com
                                        *Counsel for Plaintiffs*

## JURY DEMAND

Plaintiff makes a demand for a jury under all claims.

                                        _____
                                        Matt Hammer (#0092483)
                                        Cooper Bowen (#0093054)



**DAVID SNIDER**
**AFFIDAVIT OF MERIT**
**WEST CHESTER**

I, Keith D. Wilkey, M.D., after being duly sworn and cautioned states as follows:

1. I devote at least one-half of my professional time to the active clinical practice in my field of licensure, or its instruction in an accredited school. I am an orthopedic surgeon whose focus is on spine surgery and treatment of those with spine issues.

2. I will supplement this affidavit with another, by a letter or by testimony, based upon any information provided to me after I execute it.

3. My curriculum vitae has been previously provided to opposing counsel in these Dr. Durrani cases and can be provided again upon request. For my review, I rely upon my education, training and experience.

4. I have not counted but I have reviewed, over 200 or more cases involving Dr. Durrani and the hospitals where he once had privileges.

5. I base my opinions in part on my review of all the cases I have reviewed which have revealed similar conduct by Dr. Durrani and the hospitals where he had privileges. I have also reviewed binders provided by the Deters Law Firm which they provided to defense counsel.

6. I am familiar with applicable standard of care for Ohio, Kentucky and the country for an orthopedic/spine surgeon such as Dr. Durrani.

7. I am also familiar with applicable standard of care, policies, rules and regulations, medical executive committee bylaws, JCAHO requirements, credentialing, supervising, retention of medical staff, granting and rejecting privileges and the peer review process for West Chester Hospital, LLC, also referred to as West Chester Hospital or West Chester Medical Center and UC Health.

8. I have reviewed all relevant medical records including radiology of Dr. Durrani's medical treatment of David Snider and the medical treatment of David Snider at West Chester.

9. I have reviewed the Response to Summary Judgment in the Brenda Shell case and all the exhibits attached to it.

10. The Center for Advanced Spine Technologies, Inc. was Dr. Durrani's practice group and he was the sole owner, director and officer of CAST as well as an employee. CAST as such is also responsible for Dr. Durrani's negligence and for their failure to also supervise, discipline and retain Dr. Durrani.

1

11. I have also reviewed the nursing summary prepared by legal counsel's office for David Snider. Based upon the number of cases I've reviewed pertaining to Dr. Durrani, legal counsel's office knows what materials I need to review and provides me those materials. In addition, while this affidavit contains case specific information; it also contains information relevant to this case and/or many and/or most and/or all the other cases. It is prepared for me by counsel with my direction and approval like all of these have been.

12. Based upon my review, the following are the **facts** I rely upon:

A. Medical/social history: 44 year old divorced Caucasian male, working as a general laborer. Positive 1/ppd smoker x 25 years. Past medical history includes hypertension, GERD, abnormal EKG readings, eczema, insomnia, arrhythmia, and DJD. NKDA.

B. Mr. Snider fell off a ladder in November 2005, and has had chronic back problems since that accident. He states," I fell off a ladder (12 ft) onto a two inch wide porch railing, folding in half the wrong way and then fell another eight feet to the ground, running a screw gun into my forehead." When he came to Dr. Durrani, he listed his pain as "intolerable" and "feeling utterly helpless" about his chronic pain. Dr. Tayeb dictated," No documented history of formal physical therapy, injection strategies, and chiropractor care attempted. It is of note that he was removed from two prior practices for non-compliance and history of positive cannibus use on prior drug screens for pain management. Eventually, he was also removed from CAST's pain management clinic for refusal to go through workup and interventional procedures."

C. Mr. Snider had written on the initial paperwork for CAST,"BEEN TOLD-<u>NO PHYSICAL THERAPY</u>!" and "not supposed to lift over four pounds". There is no supporting documentation to support these statements. On 02/08/06, Mr. Snider had attended his initial, and only, therapy evaluation with Wellington Orthopedics. He was uncooperative, and refused to do much of the exercises suggested. At that visit, it was documented that Mr. Snider may return to his job as general laborer in March '06, if doing well. It was also documented on 03/07/06 by Wellington physical therapy department," the plan is to d/c therapy due to non-compliance." He was, however, compliant with picking up all pain medications monthly. According to included med logs, he was "double dipping" narcotic prescriptions from Wellington and Bethel Regional Family Healthcare, his primary care provider, who eventually discharged him as a patient for non-compliance.

D. In his initial CAST paperwork, Mr. Snider also indicated, "My ears flutter when I have back pain and my pain makes me angry and frustrated all of the time… temperature changes worsen pain…last surgeon consulted said he would not do surgery until I paralyzed myself, which he said could happen suddenly with just the wrong move. I want someone to listen to me about my pain and do what

2

needs to be done to help me". These statements are conflicting in nature, and require further work up before a surgical option is suggested. A surgeon is not a therapist or an anger management counselor.

E. Though surgery may have been indicated based on MRI results, Dr. Durrani should have thoroughly reviewed Mr. Snider's medical records and any conservative approaches that had tried and failed, as well as thoroughly educate the patient regarding reasonable outcomes, importance of physical therapy compliance, and narcotic medication education and safety. Mr. Snider has admitted to CAST physician staff on multiple occasions that he doubles his narcotic medication when needed. At his initial consultation, Dr. Durrani dictated, "He has done multiple epidural steroids." There is no documentation from The Spine Institute of these treatments prior to surgery. Dr. Durrani also dictated, "Failure of conservative treatment for many years at this point" The only documented treatment for pain control was narcotics at this point. Mr. Snider was non-compliant with his overall health, and had been relying on narcotics alone to help with his back pain for many years. His pre-op EKG indicated sinus bradycardia, ST elevation, and V1-V3.

F. On two different post ops visits, Dr, Durrani records conflicting documentation.

> 09/28/10 Post Op Visit:
> "He is now able to walk. As you recall, before surgery he was in a wheelchair, could hardly stand up. Now he is walking, ambulating with just a cane....He still is battling pain because, unfortunately, he was on so much pain medicine before." ~Dr. Durrani
> (Client has always been ambulatory)

> 08/25/11 Post Op Visit:
> "He is still complaining of a lot of back pain. He has done physical therapy, aquatic therapy. He is currently on narcotics by yourself and does not seem to be getting any better." ~Dr. Durrani
> (No documentation of ANY therapy at CAST or The Spine Institute)

G. Dr. Durrani performed one surgery on this client:

Surgery 06/30/10– Signed hospital consent for,"L5-S1 Axial Lumbar Interbody Fusion, L5-S1 Posterior Spinal Fusion, Lumbar 5-S1 Laminectomy and Foraminotomy."

Dr. Durrani lists procedures performed as "L5-S1 axial lumbar interbody fusion using allograft, L5-S1 axial lumbar interbody cage, Posterior spinal instrumentation L5-S1, Posterior spinal fusion using auto and allograft L5-S1, Lumbar laminectomy L5-S1, Bilateral lumbar foraminotomies L5-S1

Diagnostic testing:

3

- 06/06 L-Spine MRI: Significant disc space degenerative changes with some narrowing L5-S1 level. Right lateral extruded disc L5-S1 level.

- 06/08 L-Spine MRI: Worsening extruded disc L5-S1 with lumbar DDD.
- 06/08 T-Spine MRI: Negative.

- 12/08 L-Spine XR: No changes.

- 01/09 C-Spine XR: Mild spur formation w/o significant disc narrowing, normal lordotic curve on the lateral view. Mild spurring at several facet joints.

- 03/10 L-Spine MRI: Straightening of lumbar lordosis. L1-2 shows Schmorl's node formation, disc dessication, loss of disc height. L2-3 shows mild retrolisthesis w/o canal or foraminal stenosis. L3-4 w/o canal or foraminal stenosis. L4-5 shows facet arthropathy, disc desiccation, and loss of disc height. Ligamentum flavum hypertrophy, broad disc protrusion asymmetric to the right with mild to moderate right lateral recess stenosis and lateral disc component annular tears about the right L4 root within the root foramen. L5-S1 shows a disc desiccation and loss of disc height. There is spondylosis deformans, midline mixed disc protrusion abuts the S1 nerve roots bilaterally and mils foraminal stenosis with abutment of the L5 roots within the root foramina. There is also mild bilateral lateral recess stenosis.

- 09/10 L-Spine XR: No hardware abnormality identified.

- 03/11 L-Spine MRI: L1-2 shows a disc desiccation and minimal disc bulge. L2-3 shows disc desiccation and mild disc space narrowing and a broad disc protrusion causes mild thecal sac effacement. L4-5 shows disc desiccation, mild disc bulge and right foraminal disc protrusion has an annular rent causing mild narrowing of the foramen.
- 03/13 L-Spine MRI: Straightening of the lumbar spine. Post fusion and laminectomy changes are again seen at L5-S1. Subtle disc bulge mildly flattens the thecal sac. Minimal disc bulge is seen at L2-L3.

H. rhBMP-2 was used on this client during his surgery on 06/30/10.

I. The following hardware was implanted:

Implant log from IntraOp report on 06/30/10 shows:
- One Medtronic Infuse Bone Graft SM into lumbar spine
- One Orthovita Foam Bioact Vitoss Pack 10cc into lumbar spine
- One Trans1 AxiaLif Stabilization system into lumbar spine
- One Trans1 Rod Spine 3D AX 9 x 12 x 45mm into lumbar spine

4

- One Trans1 AxiaLif Universal Plug into lumbar spine
- Two Medtronic Rods Pre-Bent M8 5.5 X 40mm T1 into lumbar spine
- Two Medtronic SCR Cann MA CDH 5.5 Leg 6.5 x 40 into lumbar spine
- Two Medtronic SCR Cann MA CDH 5.5 Leg 6.5 x 45 into lumbar spine
- Four Medtronic Set SCR F/G4 INT HEX into lumbar spine

J. According to the PMA submitted by Medtronic to the FDA, Infuse was intended for a single level anterior lumbar interbody fusion performed with all three components in a specific spinal region. The three components that the Infuse device consists of are 1.) A metallic spinal fusion cage (the LT-Cage), 2.) The bone graft substitute, which consists of liquid rhBMP-2, and 3.) A spongy carrier or scaffold for the protein that resides in the fusion cage. With the exception of two non-spinal uses not relevant here, the FDA has not approved any other use of Infuse, including the posterior approach used on Mr. Snider.

K. When Dr. Durrani performed Mr. Snider's spinal fusion operation, he used only the rhBMP-2 bone graft component of the Infuse device and employed a posterior approach. Dr. Durrani did not use the other components of the Infuse device, the FDA approved cage or the spongy carrier. The off label use of BMP without the expressed or written consent and/or knowledge of Mr. Snider is a violation of standards of care, as well as a violation of the manner in which BMP could be used, in accordance with the FDA.

L. Surgery completed on 06/30/10, and the operative report was dictated on 10/31/10.

M. According to radiology and physical exams performed by physicians, all hardware is intact. Of note, 31 minutes after surgery completed, the postop nurse documented,"Dr. Durrani aware of the left upper swelling incision. Dr. Durrani noted this to be fine and apply ice as needed." There is no further documentation in the postop record about this issue. Also of note, in the Intra-op report, is written documentation from the EMG report stating,"BL EMG appeared quiet. Some periodic EMG became present in left LE prior to incision. SSEP's appear comp to BL throughout procedure. ..Periodic EMG at BL became quiet after screws were placed. Surgeon aware. EMG remained quiet during closing." In Dr. Durrani's Operative Report, which was dictated four months after procedure completion, he states that," Each pedicle was tapped. The tap was stimulated and each tap was stimulated about 10. Next, pedicle screws were placed in the pedicles of L5 and S1." There is a question of nerve damage at the time of placement.

N. Mr. Snider was referred by Dr. Durrani to Dr. Kahn at Advanced Spine and Pain management group.

O. Client states that he is in pain all of the time, and has missed work because of it. He feels Dr. Durrani made his pain worse, and then abandoned him.

13. Based upon my review, the following are my **opinions** based upon a reasonable degree of medical certainty pertaining to the deviation in standard of care or negligence, informed consent, battery and fraud claims against Dr. Durrani, CAST, West Chester and UC Health which proximately caused harm to Plaintiff:

A. Need to have additional surgery to repair problems created by Dr. Durrani

B. Implantation of Puregen without informed consent

C. Implantation of BMP-2 without informed consent

D. Failed hardware

E. Failure to obtain proper informed consent for surgery

F. Failure to provide adequate and thorough pre-operative and post-operative patient surgical education

G. Failure to properly post-op monitor the patient

H. Failure to properly perform follow up, post-op care

I. Negligent surgical techniques

J. Failure to maintain accurate and complete surgical records and surgical consent forms

K. Failure to disclose important health information to patient

L. Failure to maintain and complete discharge summary

M. Failure to supervise Dr. Durrani

N. Negligent pre-surgical diagnosis

O. Failure to prepare a timely operative report or other medical record

P. Billing for services not completed

Q. Not informing the patient another surgeon will be doing all or part of the surgery

R. Practicing outside Dr. Durrani's scope of training, education, experience, and Board certifications

6

S.  Deviation in standard of care

T.  Failure to perform thorough and accurate pre-op nonsurgical evaluation

U.  Failure by Dr. Durrani to inform patient of additional/changed procedure and reason

V.  Failure by CAST to disclose additional/changed procedure and reason to patient

W.  Failure by Dr. Durrani at CAST to properly educate patient regarding diagnosis

X.  Prior knowledge of possible complication and not acting properly upon same

Y.  Failure to disclose pertinent health information to another health care provider

Z.  Fraudulent, negligent and reckless pre-operative work up

AA.  Fraudulent, negligent and reckless surgery

BB.  Inaccurate, fraudulent, and/or exaggeration of diagnoses

CC.  Failure to properly educate patient regarding diagnoses

DD.  Failure to attempt non-surgical conservative treatment

EE.  Failure to perform thorough and accurate pre-op nonsurgical evaluation

FF. Failure by Dr. Durrani at UC/West Chester Hospital to perform accurate and complete preoperative teaching

GG.  Failure by Dr. Durrani at UC/West Chester Hospital to properly educate patient regarding diagnoses

HH.  Failure by Dr. Durrani at UC/West Chester Hospital to maintain accurate and/or complete medical records

II.  Failure of informed consent by Dr. Durrani at UC/West Chester Hospital

JJ. Failure of UC/West Chester Hospital to insure Dr. Durrani and CAST had obtained proper informed consent

KK.  Failure of UC/West Chester Hospital to obtain proper acknowledgement of consent

7

LL. Failure by Dr. Durrani at UC/West Chester Hospital to disclose pertinent health information

MM. Failure by UC/West Chester Health to disclose additional/changed procedure and reason to patient

NN. Failure by UC/West Chester Health to supervise staff

OO. Failure by UC/West Chester Medical staff to properly document abnormalities and follow up care

PP. Non-approved hardware combinations

QQ. Dr. Durrani made false and material misrepresentations of material facts intended to mislead David Snider and concealed material facts he had a duty to disclose. UC/West Chester Health and CAST concealed material facts they had a duty to disclose. David Snider was justified in relying on the misrepresentation and did rely proximately causing harm to David Snider. Dr. Durrani, CAST, and UC/West Chester Health intentionally misled David Snider. David Snider had the right to correct information.

14. The testimony, facts and exhibits of Brenda Shell's Response to Motion for Summary Judgment and Exhibits to same are applicable to all the claims against West Chester Medical Center (WCMC) and UC Health for all claims, including negligent retention and credentialing brought by Plaintiff.

15. Based upon my review of the deposition testimony, the JCAHO requirements, the MEC bylaws and all the information provided to me, I am able to adopt the following opinions relating to WCMC and UC Health pertaining to the claims against them. WCMC's and UC Health's actions and inactions detailed in this affidavit proximately caused harm to Plaintiff. WCMC and UC Health are both being referenced when only WCMC is named. I hold the following opinions relative to WCMC and UC Health pertaining to their conduct acting through their administration and MEC. The time period covered is from the time Dr. Durrani sought privileges prior to WCMC opening in May 2009 through May 2013 when he no longer had privileges. In addition to my opinions, I set forth facts I rely upon. This includes all which I referenced that I reviewed. In addition to all of the above, I attest to the following:

## FACTS

1. According to West Chester's first Executive Vice President, Carol King, she did not explore the "rumors" about Dr. Durrani's leaving Children's.

2. According to Carol King, the hospital tracked problem issues yet WCMC have failed to produce the information under peer review protection.

8

3. According to circulating nurse, Janet Smith, presets were changed in the computer to indicate the procedure Dr. Durrani performed after the procedure.

4. According to Janet Smith, despite no one at West Chester never working with Dr. Durrani before, WCMC never checked him out.

5. According to former University Hospital President (a UC Health hospital), Brian Gibler, hospitals face financial challenges.

6. According to risk manager, David Schwallie, risk management knew Durrani had issues.

7. According to radiologist, Thomas Brown, there were surgeons questioning Durrani's decisions to perform surgery.

8. According to medical staff director, Paula Hawk, a policy called "stop the lying" was implemented the same year and month they kicked out Dr. Durrani. This infers a poor environment of honesty and disclosure before this policy.

9. According to Paula Hawk and as the director of medical staff, money is not supposed to trump patient safety.

10. According to Paula Hawk, she admits peer review is for hospitals to protect each other.

11. According to Paula Hawk, she admits hospitals are interested in volume, something Dr. Durrani provided for WCMC and UC Health.

12. According to Mike Jeffers, the director of finance, they tracked Dr. Durrani's financial numbers.

13. According to Mike Jeffers, he admits Dr. Durrani helped them in their time of need.

14. According to Mike Jeffers, Dr. Durrani was the highest money generator.

15. According to Mike Jeffers, he knew Dr. Durrani had more than one surgical suite assigned at once.

16. According to Mike Jeffers, bonuses were paid to him and others based upon finances.

17. According to Dr. Peter Stern, he knew Dr. Durrani was only "satisfactory," not a world class spine surgeon as West Chester advertised.

9

18. Dr. Stern doesn't deny admitting UC Health looked the other way on Durrani because of money.

19. According to credentialing manager, Ann Shelly, there was plenty of "public knowledge" about Dr. Durrani to check before credentialing.

20. According to Ann Shelly, West Chester relied on the NPDB they knew was protected by hospitals.

21. Dr. Eric Schneeberger, Dr. Durrani's partner, was on the MEC at WCMC.

22. According to Eric Schneeberger, West Chester knew about Durrani scheduling surgeries long into the day and night.

23. According to former nursing manager, Elaine Kunko, WCMC knew about Dr. Durrani not completing records.

24. According to Elaine Kunko, WCMC knew Dr. Durrani would claim surgeries were emergency when they were not.

25. According to Elaine Kunko, WCMC knew there was an issue with Dr. Durrani not being in the room doing surgery on "his" patient.

26. According to Elaine Kunko, even the OR nurses knew WCMC put up with Dr. Durrani for money.

27. According to Elaine Kunko, WCMC tracked Dr. Durrani's financial numbers.

28. According to perioperative director, Lisa Davis, WCMC knew Durrani's office is supposed to get consents so WCMC had an obligation to make sure they did.

29. According to Jill Stegman, the risk manager at West Chester, she knew Durrani had "issues."

30. Jill Stegman confirms Gerry Goodman's complaints.

31. According to Kathy Hays, WCMC knew how Dr. Durrani used BMP-2 and PureGen.

32. Dr. Tim Kremchek, the Chief of the Orthopedic department, failed to do his job under the MEC bylaws as it related to the supervision and review of Dr. Durrani.

33. According to Dr. Tim Kremchek, he knew Dr. Durrani was "sloppy."

10

34. Kevin Joseph, the CEO of WCMC, claims to know nothing about surgery operations in his hospital.

35. Kevin Joseph, the CEO, claims a hospital must protect patients from unnecessary harm "as much as they can."

36. Kevin Joseph, the CEO, claims WCMC doesn't have oversight of surgeons doing what Plaintiff claims Durrani was doing. (Despite what his bylaws state.)

37. Kevin Joseph, the CEO, denies the hospital has any responsibility if Dr. Durrani did an unnecessary surgery.

38. Kevin Joseph, the CEO, despite his finance office tracking it, denies any knowledge of BMP-2 use.

39. Kevin Joseph, the CEO, denies knowing about any complaints about Dr. Durrani.

40. Kevin Joseph, the CEO, admits they benefited financially from Dr. Durrani, including his own pay.

41. Mark Tromba, the OR manager, admits BMP-2 use as used by Dr. Durrani.

42. According to Jeff Drapalik, the Senior Leadership team, including Joseph, met weekly and reviewed numbers.

43. According to Jeff Drapalik, the CFO of WCMC knew Dr. Durrani was a high volume money maker.

44. Lesley Gilbertson, a member of the MEC of WCMC, and anesthesiologist working with Durrani, had a concern about how long Durrani kept patients under.

45. According to materials manager, Dennis Robb, WCMC knew the volumes of BMP-2 being used.

46. According to Karen Ghaffari, WCMC knew the chart documentation of Dr. Durrani was not in compliance with their bylaws.

47. Patrick Baker, nursing VP at WCMC admits WCMC tracked the financial performance of Dr. Durrani.

48. According to nurse, Vicki Scott, the administration of WCMC knew from the outset of West Chester all the serious issues pertaining to Dr. Durrani.

11

49. According to Vicki Scott, West Chester's risk manager began to ignore complaints from Ms. Scott.

50. According to Vicki Scott, staff was scared to speak out.

51. According to Vicki Scott, patients didn't know who did the surgeries—Shanti or Durrani.

52. According to Vicki Scott, records were not accurate who was in the OR at what time.

53. According to Vicki Scott, everyone at WCMC knew it was about money.

54. According to Vicki Scott, WCMC knew about Dr. Durrani's and West Chester's illegal use of PureGen.

55. According to Vicki Scott, Dr. Durrani was a behavior problem.

56. According to patient representative, Elizabeth Dean, WCMC tracked Dr. Durrani's volumes from the outset and the CFO loved what he saw.

57. According to Elizabeth Dean, WCMC knew Dr. Durrani had issues at Children's.

58. According to Elizabeth Dean, WCMC knew Dr. Durrani was performing unnecessary procedures by volumes and repeats.

59. According to nurse, Scott Rimer, WCMC knew Dr. Durrani waited until after surgeries to document what procedures were planned.

60. According to Scott Rimer, patients at WCMC had procedures they did not consent to and WCMC knew it.

61. According to Scott Rimer, sterile fields were not protected.

62. According to Scott Rimer, WCMC knew PureGen was being used by Dr. Durrani and allowed it.

63. According to Thomas Blank, PureGen was an alternative to BMP-2, which WCMC turned to based upon insurance denials of BMP-2. In addition, Dr. Durrani operated an unethical POD of Alphatech called Evolution Medical to sell PureGen to West Chester.

64. According to Gerry Goodman, WCMC tracked BMP-2 use by Dr. Durrani; patients did not know who at times performed their surgery Dr. Shanti or Dr.

Durrani; electronic records had to be changed after Dr. Durrani's surgery; Dr. Durrani and WCMC never obtained informed consents; Dr. Durrani's volume was a warning sign of overutilization. Gerry Goodman reported all these concerns to WCMC and there was no action. Gerry Goodman was told and concluded that WCMC did not want to do anything about Dr. Durrani because of money rewards.

## ADDITIONAL OPINIONS

65. The Center of Advanced Spine Technologies (CAST) negligently supervised and retained Dr. Durrani, including by allowing Dr. Durrani to perform unnecessary procedures and surgeries; use BMP-2 and/or PureGen without appropriate consent; failing to disclose Dr. Shanti and others involvement in surgery; improper billing; changing the pre-op and post-op records to coincide when the surgery was not the surgery disclosed; and all other conduct detailed in the documents I reviewed.

66. WCMC, UC Health and CAST's motive for their actions and inactions towards Dr. Durrani was financial gain.

67. The MEC, administration and Boards of WCMC and UC Health failed to "govern the affairs of the Medical Staff."

68. The MEC, administration and Boards of WCMC and UC Health failed to enforce their rules upon Dr. Durrani as they were required to do.

69. The MEC, administration and Boards of WCMC and UC Health failed to provide oversight of Dr. Durrani as they were required to do.

70. The MEC, administration and Boards of WCMC and UC Health failed to properly evaluate Dr. Durrani.

71. The Orthopedic and Surgery Departments abdicated their responsibility under the MEC bylaws to review, investigate and supervise Dr. Durrani.

72. The MEC, administration and Boards of WCMC and UC Health failed to properly discipline Dr. Durrani including summary suspensions and revocation.

73. The MEC, administration and Boards of WCMC and UC Health failed to properly discipline under the MEC bylaws as it pertains to Dr. Durrani.

74. The MEC, administration and Boards of WCMC and UC Health ignored the information readily available pertaining to Dr. Durrani before credentialing and granting him privileges.

75. The MEC, administration and Boards of WCMC and UC Health failed to act on Dr. Durrani's disruptive behavior, unprofessional behavior and clinical performance placing Plaintiff at risk.

76. The MEC, administration and Boards of WCMC and UC Health certified and approved the unnecessary procedures of Dr. Durrani on Plaintiff knowing they were unnecessary and knowingly allowing the improper use of BMP-2 and/or PureGen and knowing there was not proper informed consent.

77. The MEC, administration and Boards of WCMC and UC Health failed to act on Dr. Durrani's failure in medical record documentation.

78. The MEC, administration and Boards of WCMC and UC Health failed to require Dr. Durrani to follow the rules for off label experimental procedures.

79. The MEC, administration and Boards of WCMC and UC Health allowed Dr. Durrani to use undisclosed and unqualified surgeons to perform his surgeries including Dr. Shanti.

80. The MEC, administration and Boards of WCMC and UC Health allowed Dr. Durrani to do multiple surgeries at once.

81. WCMC and UC Health have refused to provide as privileged the peer review information from WCMC for Dr. Durrani to either me or their own expert. Therefore, we have no knowledge of what action, if any, was taken against him. However, based upon the facts here, it is obvious they failed to take action.

82. Based upon all of the above, it's my opinion that WCMC and UC Health were negligent in their credentialing, supervising, disciplining and retaining Dr. Durrani on staff and allowing him to obtain and keep privileges at WCMC under the standards of Ohio as detailed in the Brenda Shell's Response to Motion for Summary Judgment and this proximately caused harm to Plaintiff.

83. The facts support David Snider's claim for negligence, battery, lack of consent and fraud.

84. As a result of the negligence and conduct of Dr. Durrani, CAST, West Chester and UC Health, David Snider suffered damages proximately caused by them, including the following:

    A. Permanent disability
    B. Physical deformity and scars
    C. Past, Current and Future Physical and Mental Pain and Suffering
    D. Lost income past, present and future
    E. Loss of enjoyment of life

14

F.  Past medical expenses
G.  Future medical expenses approximately in the amount of $50,000 to $250,000 depending on course of treatment
H.  Aggravation of a pre-existing condition
I.  Decreased ability to earn income
J.  3% increased risk of cancer and fear of cancer if BMP-2 was used.

AFFIANT SAYETH FURTHER NOT

_____
KEITH D. WILKEY, M.D.

NOTARY

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me, a Notary Public, by

Keith D. Wilkey, M.D. on this ___7___ day of May, 2015.

_____
NOTARY PUBLIC
My Commission Exp.: _2-16-19_

_St. Louis_ County

State of _Missouri_

SUSAN K VIETMEIER
Notary Public - Notary Seal
State of Missouri, St Louis County
Commission # 15009831
My Commission Expires Feb 16, 2019

15

# UC Health.

P.O. Box 740117
Cincinnati, OH 45274-0117

**ITEMIZED BILL**

TAX ID: 311588499

| DATE | PAGE |
|---|---|
| 04/30/13 | 1 of 5 |

| PATIENT NAME / FACILITY | ACCOUNT NUMBER | SEX | AGE | ADMIT DATE | DISCHARGE DATE |
|---|---|---|---|---|---|
| SNIDER, DAVID<br>WEST CHESTER HOSPITAL | 219667987 | M | 43 | 06/30/10 | 07/02/10 | 3

**ATTENDING PHYSICIAN**
DURRANI, ABUBAKAR

MEDICARE A & B
ADMINASTAR FEDERAL
PO BOX 145482
CINCINNATI      OH   45250

IF YOU ARE PAYING BY CREDIT CARD

☐ VISA  ☐ ☐ ☐ ☐ ☐

CARD NUMBER

SIGNATURE                          EXP DATE

SHOW AMOUNT
PAID HERE  $

* Return this portion with your payment.

| DATE OF SERVICE | QUANTITY | SERVICE CODE | ACTIVITY | | TRANSACTION AMOUNT |
|---|---|---|---|---|---|
| 06/23/10 | 1 | 300 | ABO TYPE | 86900 | 41.00 |
| 06/23/10 | 1 | 300 | ANTIBODY SCREEN, EACH INCUBATION | 86850 | 91.00 |
| 06/23/10 | 1 | 300 | RH | 86901 | 25.00 |
| 06/23/10 | 1 | 301 | BASIC METABOLIC | 80048 | 90.00 |
| 06/23/10 | 1 | 305 | CBC W/O DIFFERENTIAL | 85027 | 53.00 |
| 06/23/10 | 1 | 305 | PARTIAL THROMBOPLASTIN TIME | 85730 | 52.00 |
| 06/23/10 | 1 | 305 | PROTHROMBIN TIME | 85610 | 47.00 |
| 06/23/10 | 1 | 307 | URINALYSIS | 81003 | 34.00 |
| 06/23/10 | 1 | 306 | STAPH AUREUS | 87081 | 97.00 |
| 06/23/10 | 1 | 300 | PHLEBOTOMY | 36415 | 17.00 |
| 06/30/10 | 1 | 121 | SEMI PRIVATE MED/SURG | | 995.00 |
| 06/30/10 | 1 | 710 | PRE OP LEVEL 2 EVERY 1/2 HOUR | | 0.00 |
| 06/30/10 | 1 | 370 | ANES COMPLEX (46 +) | | 543.00 |
| 06/30/10 | 15 | 370 | ANES COMPLEX (30 - 45) ADDITIONAL | | 277.50 |
| 06/30/10 | 148 | 370 | ANES COMPLEX - ADDITIONAL 1 MINUTE | | 2,738.00 |
| 06/30/10 | 1 | 360 | OR - CONTRACTED SERVICE - 1ST HALF | | 8,275.00 |
| 06/30/10 | 163 | 360 | OR - CONTRACTED SERVICE - EA ADDIT | | 12,225.00 |
| 06/30/10 | 1 | 710 | PACU TYPE 4 0-60 | | 865.00 |
| 06/30/10 | 1 | 710 | PACU TYPE 4 ADD 30 | | 339.00 |
| 06/30/10 | 2 | 278 | SCR CANN MA CDH 5.5 LEG 6.5X45 | | 8,193.96 |
| 06/30/10 | 2 | 278 | SCR CANN MA CDH 5.5 LEG 6.5X40 | | 8,193.96 |
| 06/30/10 | 4 | 278 | SET SCR F/G4 INT HEX | | 2,135.04 |
| 06/30/10 | 1 | 278 | AXIALIF STABILIZATION SYST | | 22,450.50 |
| 06/30/10 | 2 | 278 | ROD PRE-BENT M8 5.5X40MM TI | | 2,747.00 |
| 06/30/10 | 1 | 272 | TIGHT DISC CUTTER 4-PACK | | 2,416.50 |
| 06/30/10 | 1 | 272 | TISSUE EXTRACTOR 4-PACK | | 1,606.50 |
| 06/30/10 | 1 | 272 | DIL LG DISP | | 737.10 |
| 06/30/10 | 2 | 272 | NDL PK 2 TRCR TIP | | 989.82 |
| 06/30/10 | 1 | 278 | GWIRE SEXTANT GUID BLNT | C1769 | 193.75 |
| 06/30/10 | 1 | 272 | BUR LEGEND MTCH HD 14CMX3MM | | 197.45 |
| 06/30/10 | 1 | 272 | BUR LEGEND TAPR 8CMX1.5MM | | 179.55 |
| 06/30/10 | 1 | 278 | INFUS SET BONE GRFT SM | | 9,344.30 |
| 06/30/10 | 1 | 278 | FOAM BIOACT VITOSS PACK 10CC | | 5,629.50 |
| 06/30/10 | 1 | 320 | DIAG LS SPINE 2 OR 3 VIEWS | 72100 | 265.00 |
| 06/30/10 | 1 | 320 | DIAG FLOURO > 1 HOUR | 76001 | 603.00 |
| 06/30/10 | 1 | 251 | BUPIVACAINE HCL/EPI 0.5-0.0005 VIA | | 26.05 |
| 06/30/10 | 1 | 251 | CALCIUM CHLORIDE 100MG/ML VIAL IV | | 24.35 |

*Need Help?*

| Questions: | Billing Disputes: | Customer Service Hours: | BALANCE DUE |
|---|---|---|---|
| pfs@uchealth.com | UC Health Attn: Billing Disputes<br>3200 Burnet Ave Cincinnati, OH 45229 | M -TH 8AM - 9PM, F 8AM - 4:30PM<br>513-585-7600 or 1-800-277-0781 | CONTINUED |



EXHIBIT
B

ALL-STATE LEGAL

# UC Health.
P.O. Box 740117
Cincinnati, OH 45274-0117

**ITEMIZED BILL**

| DATE | PAGE |
|---|---|
| 04/30/13 | 2 of 5 |

TAX ID: 311588499

| PATIENT NAME / FACILITY | ACCOUNT NUMBER | SEX | AGE | ADMIT DATE | DISCHARGE DATE | |
|---|---|---|---|---|---|---|
| SNIDER, DAVID<br>WEST CHESTER HOSPITAL | 219667987 | M | 43 | 06/30/10 | 07/02/10 | 3 |

| ATTENDING PHYSICIAN |
|---|
| DURRANI, ABUBAKAR |

MEDICARE A & B
ADMINASTAR FEDERAL
PO BOX 145482
CINCINNATI    OH   45250



IF YOU ARE PAYING BY CREDIT CARD

CARD NUMBER

SIGNATURE                    EXP DATE

SHOW AMOUNT PAID HERE  $

\* Return this portion with your payment.

| DATE OF SERVICE | QUANTITY | SERVICE CODE | ACTIVITY | | TRANSACTION AMOUNT |
|---|---|---|---|---|---|
| 06/30/10 | 1 | 637 | DOCUSATE SODIUM 100MG CAPSULE | | 1.65 |
| 06/30/10 | 1 | 251 | FAMOTIDINE 10MG/ML VIAL IV | | 22.20 |
| 06/30/10 | 1 | 250 | GELATIN SPONGE,ABSORBABLE 100 SPON | | 69.95 |
| 06/30/10 | 1 | 636 | HYDROMORPHONE HCL 2MG/ML DIS SYR I | J1170 | 27.20 |
| 06/30/10 | 1 | 250 | LIDOCAINE 2% SYRINGE | | 24.75 |
| 06/30/10 | 1 | 636 | METHOCARBAMOL 100MG/ML VIAL INJ | J2800 | 100.90 |
| 06/30/10 | 1 | 636 | MIDAZOLAM 1MG/ML 2ML VIAL | J2250 | 24.65 |
| 06/30/10 | 1 | 636 | ONDANSETRON HCL 2MG/ML VIAL IV | J2405 | 21.80 |
| 06/30/10 | 1 | 637 | OXYCODONE HCL 10MG TAB PO SA | | 28.95 |
| 06/30/10 | 1 | 636 | PHENYLEPHRINE HCL 10MG/ML VIAL 1 M | J2370 | 33.25 |
| 06/30/10 | 2 | 251 | PROPOFOL 10MG/ML AMP IV | | 30.35 |
| 06/30/10 | 1 | 251 | REMIFENTANIL HCL 2MG VIAL IV | | 204.25 |
| 06/30/10 | 1 | 636 | RINGERS SOLUTION,LACTATED IVSL IV | J7120 | 78.25 |
| 06/30/10 | 2 | 636 | RINGERS SOLUTION,LACTATED IVSL IV | J7120 | 80.50 |
| 06/30/10 | 1 | 636 | RINGERS SOLUTION,LACTATED IVSL IV | J7120 | 75.95 |
| 06/30/10 | 1 | 636 | RINGERS SOLUTION,LACTATED IVSL IV | J7120 | 75.95 |
| 06/30/10 | 1 | 258 | SODIUM CHLORIDE0.9% IVSL IV 100ML | | 76.25 |
| 06/30/10 | 1 | 636 | SUCCINYLCHOL CL 20MG/ML VIAL INJ | J0330 | 25.95 |
| 06/30/10 | 1 | 250 | THROMBIN 5MU VIAL TOP | | 188.30 |
| 06/30/10 | 1 | 636 | DEXAMETHASONE 4MG/ML INJECTION 5ML | J1100 | 22.60 |
| 06/30/10 | 1 | 636 | HYDROMORPHONE HCL 1MG/ML DIS SYR I | J1170 | 27.70 |
| 06/30/10 | 1 | 637 | GABAPENTIN 600MG TAB PO | | 4.50 |
| 06/30/10 | 1 | 258 | SOD. CHLORIDE 0.9% 100ML A/V | | 77.05 |
| 06/30/10 | 1 | 258 | SOD. CHLORIDE 0.9% 100ML A/V | | 77.05 |
| 06/30/10 | 1 | 636 | FENTANYL 250 MCG/5 ML AMP INJ | J3010 | 26.95 |
| 06/30/10 | 2 | 636 | DEXAMETHASONE 4MG/ML INJECTION 1ML | J1100 | 24.00 |
| 06/30/10 | 2 | 636 | DEXAMETHASONE 4MG/ML INJECTION 1ML | J1100 | 24.00 |
| 06/30/10 | 1 | 251 | CEFAZOLIN SODIUM 1G VIAL A/V | | 26.40 |
| 06/30/10 | 1 | 251 | CEFAZOLIN SODIUM 1G VIAL A/V | | 26.40 |
| 06/30/10 | 1 | 250 | PREGABALIN 150MG CAPSULE | | 30.95 |
| 06/30/10 | 2 | 251 | FLOSEAL HT SEALANT 10 ML | | 2,011.15 |
| 06/30/10 | 1 | 636 | FENTANYL VIAL 50 MCG/ML 2 ML | J3010 | 26.80 |
| 06/30/10 | 1 | 636 | FENTANYL VIAL 50 MCG/ML 2 ML | J3010 | 26.80 |
| 06/30/10 | 1 | 270 | SLEEVE DVT KNEE #189071 (REPROCESS | | 25.00 |
| 06/30/10 | 2 | 990 | ROD PRE-BENT M8 5.5X40MM TI | | 0.00 |
| 06/30/10 | 1 | 990 | INFUS SET BONE GRFT SM | | 0.00 |
| 06/30/10 | 1 | 990 | AXIALIF STABILIZATION SYST | | 0.00 |

*Need Help?*

**Questions:**
pfs@uchealth.com

**Billing Disputes:**
UC Health Attn: Billing Disputes
3200 Burnet Ave Cincinnati, OH 45229

**Customer Service Hours:**
M -TH 8AM - 9PM, F 8AM - 4:30PM
513-585-7600 or 1-800-277-0781

BALANCE DUE

CONTINUED

# UC Health

P.O. Box 740117
Cincinnati, OH 45274-0117

| | ITEMIZED BILL | | DATE | PAGE |
|---|---|---|---|---|
| | | TAX ID: | 04/30/18 | 3 of 5 |
| | | | 311588499 | |

| PATIENT NAME / FACILITY | ACCOUNT NUMBER | SEX | AGE | ADMIT DATE | DISCHARGE DATE | |
|---|---|---|---|---|---|---|
| SNIDER, DAVID<br>WEST CHESTER HOSPITAL | 219667987 | M | 43 | 06/30/10 | 07/02/10 | 3 |

| | ATTENDING PHYSICIAN |
|---|---|
| | DURRANI, ABUBAKAR |

MEDICARE A & B
ADMINASTAR FEDERAL
PO BOX 145482
CINCINNATI      OH  45250

IF YOU ARE PAYING BY CREDIT CARD

CARD NUMBER  ☐ ☐ VISA ☐ ☐ ☐ ☐ ☐

SIGNATURE                    EXP DATE

SHOW AMOUNT PAID HERE  $

* Return this portion with your payment

| DATE OF SERVICE | QUANTITY | SERVICE CODE | ACTIVITY | | TRANSACTION AMOUNT |
|---|---|---|---|---|---|
| 06/30/10 | 1 | 990 | FOAM BIOACT VITOSS PACK 10CC | | 0.00 |
| 06/30/10 | 1 | 990 | GWIRE SEXTANT GUID BLNT | | 0.00 |
| 06/30/10 | 2 | 990 | SCR CANN MA CDH 5.5 LEG 6.5X45 | | 0.00 |
| 06/30/10 | 2 | 990 | SCR CANN MA CDH 5.5 LEG 6.5X40 | | 0.00 |
| 06/30/10 | 4 | 990 | SET SCR F/G4 INT HEX | | 0.00 |
| 06/30/10 | 1 | 940 | IV HYDRATION INFUSION-EACH ADD'L H | 96361 | 0.00 |
| 06/30/10 | 1 | 940 | IV INFUSION- EACH ADD'L HR | 96366 | 0.00 |
| 06/30/10 | 2 | 940 | INJECT MEDICINE,IV PUSH, INITIAL | 96374 | 0.00 |
| 06/30/10 | 2 | 940 | INJ MEDICINE,IV PUSH ADDL NEW SUBS | 96375 | 0.00 |
| 07/01/10 | 1 | 121 | SEMI PRIVATE MED/SURG | | 1,095.00 |
| 07/01/10 | 1 | 460 | RC OXIMETER SPOTCHECK ADULT | 94760 | 69.00 |
| 07/01/10 | 1 | 460 | RC INCENTIVE SPIR TX | 94150 | 0.00 |
| 07/01/10 | 1 | 460 | RC ASSESSMENT LIMITED COUNTER | | 0.00 |
| 07/01/10 | 1 | 637 | DIAZEPAM 5MG TABLET | | 24.50 |
| 07/01/10 | 1 | 637 | DIAZEPAM 5MG TABLET | | 24.50 |
| 07/01/10 | 1 | 637 | DOCUSATE SODIUM 100MG CAPSULE | | 1.65 |
| 07/01/10 | 1 | 637 | DOCUSATE SODIUM 100MG CAPSULE | | 1.65 |
| 07/01/10 | 1 | 637 | FAMOTIDINE 20MG TAB PO | | 3.85 |
| 07/01/10 | 1 | 637 | HYDROCHLOROTHIAZIDE 25MG TAB PO | | 3.80 |
| 07/01/10 | 1 | 637 | HYDROMORPHONE HCL 4MG TAB PO | | 24.95 |
| 07/01/10 | 1 | 636 | METHOCARBAMOL 100MG/ML VIAL INJ | J2800 | 100.90 |
| 07/01/10 | 2 | 637 | METHOCARBAMOL 750MG TAB PO | | 4.40 |
| 07/01/10 | 2 | 637 | METHOCARBAMOL 750MG TAB PO | | 4.40 |
| 07/01/10 | 1 | 636 | MORPHINE SULFATE 4MG/ML DIS SYR IN | J2270 | 27.70 |
| 07/01/10 | 1 | 636 | MORPHINE SULFATE 4MG/ML DIS SYR IN | J2270 | 27.70 |
| 07/01/10 | 1 | 637 | NICOTINE 7MG/24HR PATCH TD | | 8.55 |
| 07/01/10 | 1 | 637 | OXYCODONE HCL 10MG TAB PO SA | | 28.95 |
| 07/01/10 | 1 | 637 | OXYCODONE HCL 10MG TAB PO SA | | 28.95 |
| 07/01/10 | 1 | 637 | OXYCODONE HCL 10MG TAB PO SA | | 28.95 |
| 07/01/10 | 2 | 637 | OXYCODONE HCL/APAP 5-325MG TAB PO | | 24.95 |
| 07/01/10 | 2 | 637 | OXYCODONE HCL/APAP 5-325MG TAB PO | | 24.95 |
| 07/01/10 | 2 | 637 | OXYCODONE HCL/APAP 5-325MG TAB PO | | 24.95 |
| 07/01/10 | 2 | 637 | OXYCODONE HCL/APAP 5-325MG TAB PO | | 24.95 |
| 07/01/10 | 2 | 637 | OXYCODONE HCL/APAP 5-325MG TAB PO | | 24.95 |
| 07/01/10 | 1 | 637 | TEMAZEPAM 7.5MG CAP PO | | 47.40 |
| 07/01/10 | 1 | 637 | TEMAZEPAM 7.5MG CAP PO | | 46.00 |
| 07/01/10 | 1 | 637 | GABAPENTIN 600MG TAB PO | | 4.50 |

*Need Help?*

Questions:
pfs@uchealth.com

Billing Disputes:
UC Health Attn: Billing Disputes
3200 Burnet Ave Cincinnati, OH 45229

Customer Service Hours:
M -TH 8AM - 8PM, F 8AM - 4:30PM
513-585-7600 or 1-800-277-0781

| BALANCE DUE |
|---|
| CONTINUED |



# UC Health.

P.O. Box 740117
Cincinnati, OH 45274-0117

**ITEMIZED BILL**

| DATE | PAGE |
|------|------|
| 04/30/13 | 4 of |

TAX ID: 311588499

| PATIENT NAME / FACILITY | ACCOUNT NUMBER | SEX | AGE | ADMIT DATE | DISCHARGE DATE |
|---|---|---|---|---|---|
| SNIDER, DAVID WEST CHESTER HOSPITAL | 219667987 | M | 43 | 06/30/10 | 07/02/10 |

3

| ATTENDING PHYSICIAN |
|---|
| DURRANI, ABUBAKAR |

MEDICARE A & B
ADMINASTAR FEDERAL
PO BOX 145482
CINCINNATI          OH   45250

IF YOU ARE PAYING BY CREDIT CARD

☐ VISA ☐ ☐ AMEX ☐ ☐ DISC ☐

CARD NUMBER

SIGNATURE                    EXP DATE

SHOW AMOUNT PAID HERE  $

* Return this portion with your payment

| DATE OF SERVICE | QUANTITY | SERVICE CODE | ACTIVITY | | TRANSACTION AMOUNT |
|---|---|---|---|---|---|
| 07/01/10 | 1 | 637 | GABAPENTIN 600MG TAB PO | | 4.50 |
| 07/01/10 | 2 | 636 | DEXAMETHASONE 4MG/ML INJECTION 1ML | J1100 | 24.00 |
| 07/01/10 | 2 | 636 | DEXAMETHASONE 4MG/ML INJECTION 1ML | J1100 | 24.00 |
| 07/01/10 | 2 | 636 | DEXAMETHASONE 4MG/ML INJECTION 1ML | J1100 | 24.00 |
| 07/01/10 | 1 | 250 | PREGABALIN 150MG CAPSULE | | 30.95 |
| 07/01/10 | 1 | 250 | PREGABALIN 150MG CAPSULE | | 30.95 |
| 07/01/10 | 1 | 430 | OT EVALUATION | 97003 | 265.00 |
| 07/01/10 | 1 | 424 | PT EVALUATION | 97001 | 265.00 |
| 07/02/10 | 1 | 637 | DIAZEPAM 5MG TABLET | | 24.50 |
| 07/02/10 | 1 | 637 | DIAZEPAM 5MG TABLET | | 24.50 |
| 07/02/10 | 1 | 637 | HYDROCHLOROTHIAZIDE 25MG TAB PO | | 3.80 |
| 07/02/10 | 1 | 637 | HYDROMORPHONE HCL 4MG TAB PO | | 24.95 |
| 07/02/10 | 1 | 637 | HYDROMORPHONE HCL 4MG TAB PO | | 24.95 |
| 07/02/10 | 1 | 637 | HYDROMORPHONE HCL 4MG TAB PO | | 24.95 |
| 07/02/10 | 2 | 637 | METHOCARBAMOL 750MG TAB PO | | 4.40 |
| 07/02/10 | 2 | 637 | METHOCARBAMOL 750MG TAB PO | | 4.40 |
| 07/02/10 | 2 | 637 | METHOCARBAMOL 750MG TAB PO | | 4.40 |
| 07/02/10 | 1 | 637 | NICOTINE 7MG/24HR PATCH TD | | 8.55 |
| 07/02/10 | 1 | 637 | OXYCODONE HCL 10MG TAB PO SA | | 28.95 |
| 07/02/10 | 1 | 637 | OXYCODONE HCL 10MG TAB PO SA | | 28.95 |
| 07/02/10 | 1 | 637 | GABAPENTIN 600MG TAB PO | | 4.50 |
| 07/02/10 | 2 | 636 | DEXAMETHASONE 4MG/ML INJECTION 1ML | J1100 | 24.00 |
| 07/02/10 | 2 | 636 | DEXAMETHASONE 4MG/ML INJECTION 1ML | J1100 | 24.00 |
| 07/02/10 | 2 | 636 | DEXAMETHASONE 4MG/ML INJECTION 1ML | J1100 | 24.00 |
| 07/02/10 | 1 | 250 | PREGABALIN 150MG CAPSULE | | 30.95 |
| 07/02/10 | 1 | 270 | LONG HANDLE SPONGERVICE - 1ST HALF | | 17.52 |
| 07/02/10 | 1 | 273 | REACHERNTRACTED SERVICE - 1ST HALF | | 37.77 |
| 07/02/10 | 1 | 430 | OT THERAPEUTIC ACTIVITIES (15 MIN) | 97530 | 116.00 |
| 07/02/10 | 1 | 430 | OT SELF CARE/ADL 15 MINUTES | 97535 | 114.00 |
| 07/02/10 | 2 | 420 | PT GAIT TRAINING 15 MINS | 97116 | 228.00 |

*Need Help?*

Questions:
pfs@uchealth.com

Billing Disputes:
UC Health Attn: Billing Disputes
3200 Burnet Ave Cincinnati, OH 45229

Customer Service Hours:
M -TH 8AM - 9PM, F 8AM - 4:30PM
513-585-7600 or 1-800-277-0781

BALANCE DUE



 **Health.**
P.O. Box 740117
Cincinnati, OH 45274-0117

**ITEMIZED BILL**

| DATE | PAGE |
|---|---|
| 04/30/13 | 5 of |

TAX ID: 311588499

| PATIENT NAME / FACILITY | ACCOUNT NUMBER | SEX | AGE | ADMIT DATE | DISCHARGE DATE |
|---|---|---|---|---|---|
| SNIDER, DAVID<br>WEST CHESTER HOSPITAL | 219667987 | M | 43 | 06/30/10 | 07/02/10 |

| ATTENDING PHYSICIAN |
|---|
| DURRANI, ABUBAKAR |

MEDICARE A & B
ADMINASTAR FEDERAL
PO BOX 145482
CINCINNATI    OH  45250



\* Return this portion with your payment

| DATE OF SERVICE | QUANTITY | SERVICE CODE | ACTIVITY | TRANSACTION AMOUNT |
|---|---|---|---|---|
| | | | ------ SUMMARY OF DETAIL CHARGES ------ | |
| | 2 | 121 | SEMI ROOM AND BOARD SURG-GY | 2,090.00 |
| | 7 | 250 | PHARMACY | 406.80 |
| | 10 | 251 | PHARMACY, GENERIC | 2,371.15 |
| | 3 | 258 | PHARM | 230.35 |
| | 2 | 270 | MED/SURG SUPPLY | 42.52 |
| | 7 | 272 | STERILE SUPPLY | 6,126.92 |
| | 1 | 273 | TAKEHOME SUPPLY | 37.77 |
| | 14 | 278 | MED/SURG SUP, OTHER IMPLANTS | 58,888.09 |
| | 4 | 300 | LABORATORY | 174.00 |
| | 1 | 301 | LAB/CHEMISTRY | 90.00 |
| | 3 | 305 | LAB/HEMOTOLOGY | 152.00 |
| | 1 | 306 | LAB/BACT-MICRO | 97.00 |
| | 1 | 307 | LAB/UROLOGY | 34.00 |
| | 2 | 320 | DIAGNOSTIC RAD | 868.00 |
| | 164 | 360 | O/R SERVICES - GENERAL | 20,500.00 |
| | 164 | 370 | ANESTHESIA | 3,558.50 |
| | 2 | 420 | PHYSICAL THERAPY | 228.00 |
| | 1 | 424 | PT EVALUATION | 265.00 |
| | 3 | 430 | OCCUPATIONAL THERAPY | 495.00 |
| | 1 | 460 | PULMONARY FUNCTION | 69.00 |
| | 35 | 636 | DRUGS REQ SPEC ID | 1,023.55 |
| | 49 | 637 | SELF ADM DRUGS | 688.10 |
| | 2 | 710 | RECOVERY ROOM | 1,204.00 |

*Need Help?*

Questions:
pfs@uchealth.com

Billing Disputes:
UC Health Attn: Billing Disputes
3200 Burnet Ave Cincinnati, OH 45229

Customer Service Hours:
M -TH 8AM - 9PM, F 8AM - 4:30PM
513-585-7600 or 1-800-277-0781

**BALANCE DUE**




**MARY L. SWAIN**
BUTLER COUNTY CLERK OF COURTS

L000343249

**WEST CHESTER HOSPITAL L L C**
**GH&R BUSINESS SVCS INC**
**511 WALNUT STREET**
**1900 FIFTH THIRD CENTER**
**CINCINNATI, OH 45202**

---

Date:   May 19, 2015                    Case No. : CV 2015 05 1183
        DAVID SNIDER vs. ABUBAKAR ATIQ DURRANI M D et al

---

**S U M M O N S   O N   C O M P L A I N T   B Y   C E R T I F I E D   M A I L**
**C O U R T   O F   C O M M O N   P L E A S ,   B U T L E R   C O U N T Y ,   O H I O**

To the above named party: You are hereby summoned to answer a complaint that has been filed against you in the Butler County Common Pleas Court by the plaintiff(s) named herein. A copy of the complaint is attached.

You are required to serve upon the plaintiff(s) attorney, or upon the plaintiff(s) if there is no attorney of record, a copy of your answer to the complaint within 28 days after receipt of this summons, exclusive of the day of service. The answer must be filed with this court within three days after service on Plaintiff's attorney.

The name and address of the plaintiff(s) attorney is as follows:

> COOPER BOWEN
> DETERS LAW FIRM  5247 MADISON PIKE
> INDEPENDENCE, KY  41051

If you fail to appear and defend, judgment by default may be taken against you for the relief demanded in the complaint.

**MARY L. SWAIN**
Butler County Clerk of Courts

*Mary L. Swain*

By: <u>Kristen Merkle</u>
Deputy Clerk

---



# MARY L. SWAIN
## BUTLER COUNTY CLERK OF COURTS

L000343250

**U C HEALTH**
**SERVE: GH&R BUSINESS SVCS INC**
**511 WALNUT ST 1900 FIFTH THIRD CENTER**
**CINCINNATI, OH 45202**

Date:   May 19, 2015                          Case No. : CV 2015 05 1183
        DAVID SNIDER vs. ABUBAKAR ATIQ DURRANI M D et al

### SUMMONS ON COMPLAINT BY CERTIFIED MAIL
### COURT OF COMMON PLEAS, BUTLER COUNTY, OHIO

To the above named party: You are hereby summoned to answer a complaint that has been filed against you in the Butler County Common Pleas Court by the plaintiff(s) named herein. A copy of the complaint is attached.

You are required to serve upon the plaintiff(s) attorney, or upon the plaintiff(s) if there is no attorney of record, a copy of your answer to the complaint within 28 days after receipt of this summons, exclusive of the day of service. The answer must be filed with this court within three days after service on Plaintiff's attorney.

The name and address of the plaintiff(s) attorney is as follows:

        COOPER BOWEN
        DETERS LAW FIRM  5247 MADISON PIKE
        INDEPENDENCE, KY   41051

If you fail to appear and defend, judgment by default may be taken against you for the relief demanded in the complaint.

**MARY L. SWAIN**
Butler County Clerk of Courts

*Mary L. Swain*

By: <u>Kristen Merkle</u>
Deputy Clerk